UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

TL TOYS HK, LTD.,                                    Civ. No.: 07 CV 1366 (DAB)

                          Plaintiff,

              -against-

CHRISHA CREATIONS, LTD.,

                          Defendant.

-------------------------------------------------------------X

## MEMORANDUM OF LAW IN REPLY AND IN FURTHER SUPPORT OF CHRISHA CREATIONS, LTD.'S MOTION TO DISMISS

RIVKIN RADLER LLP
Celeste M. Butera
Joseph K. Poe
926 RexCorp Plaza
Uniondale, NY 11556-0926
(516) 357-3000
Attorneys for Defendant
CHRISHA CREATIONS, LTD.

## TABLE OF CONTENTS

**Page**

SUMMARY OF THE ARGUMENT ................................................................................1

ARGUMENT.................................................................................................................1

A.   This Court is the Appropriate Forum for Chrisha's Motion to Dismiss ...........................1

B.   The Issues in the Competing Actions  Invoke the "First-Filed" Rule................................3

C.   TL's Argument Regarding Improper Service in the Rhode Island Action is also not a Valid Basis to Deny Chrisha's Motion to Dismiss ............................................................4

   1.   It is for the Rhode Island District Court to Determine Whether Service Upon TL was Properly Performed ...........................................................................................4

   2.   In any event, the Date of Service of the Complaint is not Relevant to the "First-Filed" Rule Analysis ............................................................................................5

   3.   Chrisha Properly Served TL in the Rhode Island Action................................................6

   4.   Even if Service was not Properly Performed, Chrisha Can Still Perform Service Upon TL .........................................................................................................9

D.   TL Has Not Met Its Burden to Establish that an Exception to the First-Filed Rule Applies ..................................................................................................................10

## SUMMARY OF THE ARGUMENT

There is no valid basis to deny Chrisha's motion to dismiss this lawsuit. There is no dispute that Chrisha's action was filed first in Rhode Island more than three months before this action was filed. Chrisha's first-filed Rhode Island lawsuit and this lawsuit arise out of the exact same transactions. Whether service of process was validly effectuated in the Rhode Island lawsuit is irrelevant to the first-filed rule analysis because the rule is applied based solely on the dates of filing and not the dates of service. Further, it is the Rhode Island Court that must decide the specious claim by TL that service of process was not properly made. TL does not deny that it received actual service of the Rhode Island lawsuit. And finally TL has failed completely to demonstrate that there are special circumstances that favor departure from the application of the well-established first filed rule. Accordingly, Chrisha's motion should be granted and this action should be dismissed.

## ARGUMENT

### A.    This Court is the Appropriate Forum for Chrisha's Motion to Dismiss

Chrisha properly filed this motion to dismiss the New York Action -- the second-filed action -- in lieu of an answer to TL's complaint because courts in this District, presiding over second-filed actions, regularly entertain and properly grant motions to dismiss or transfer the second filed actions based upon the first-filed rule. *See, e.g., GMT Corp. v. Quiksilver*, Case No. 02 Civ. 2229, 2002 U.S. Dist. LEXIS 14195 (S.D.N.Y. July 31, 2002) (Daniels, J.) (granting defendant's motion to transfer); *Everest Capital Ltd. v. Everest Funds Management, L.L.C.*, 178 F. Supp. 2d 459 (S.D.N.Y. 2002) (Swain, J.) (granting defendant's motion to transfer); *Kellen Co., Inc. v. Calphalon Corp.*, 54 F. Supp. 2d 218 (S.D.N.Y. 1999) (Parker, J.) (granting defendant's motion to dismiss); *Manufacturers Hanover Trust Co. v. Palmer Corp.*, 798 F. Supp. 161 (S.D.N.Y. 1992) (Haight, J.) (granting defendant's motion to transfer); *Interwood Marketing*

*Ltd. v. Media Arts International Ltd.*, Case No. 90 Civ. 4690, 1990 U.S. Dist. LEXIS 16747 (S.D.N.Y. Dec. 12, 1990) (Sand, J.) (granting defendant's motion to dismiss).

For example, in *Interwood Marketing*, the plaintiff, Interwood Marketing, filed a complaint against the defendant, Media Arts, in the Southern District of New York (the "New York City action"). 1990 U.S. Dist. LEXIS 16747, *2. However, Media Arts had previously filed a complaint against Interwood Marketing in the Eastern District of Pennsylvania three months earlier in April 1990 (the "Philadelphia action"). *Id.* at *1-2. Accordingly, Media Arts filed a motion to dismiss in the second-filed New York City action, which sought dismissal of the New York City action in favor of the first-filed Philadelphia action. *Id.* at *2. Although Media Arts has plainly filed the Philadelphia action against Interwood Marketing three months before Interwood Marketing filed the New York City action against Media Arts, Interwood Marketing contended that the New York City action was "first-filed" because it had performed service upon Media Arts before Media Arts performed service of the Philadelphia action upon Interwood Marketing. *Id.* at *6-7. The Court (Sand, J.) rejected Interwood Marketing's argument and granted Media Arts' motion, finding that the Philadelphia action was the first-filed of the two competing actions, and dismissing the New York City action against Media Arts. *Id.* at *9.

Here, Chrisha filed the Rhode Island Action more than three months before TL filed the New York Action. Chrisha's motion to dismiss in lieu of an answer to TL's complaint is appropriately made in this action. Therefore, it is respectfully submitted that the Court can and should entertain and grant Chrisha's motion to dismiss.

**B.    The Issues in the Competing Actions Invoke the "First-Filed" Rule**

TL's argument that the actions are not identical and thus the "first-filed" rule should not apply is wrong and must be rejected.[1]  The test in this Circuit[2] as to whether a second filed action should be dismissed in favor of the first filed action is whether the competing actions must "arise out of the same factual grouping, transaction or series of transactions", in order for the first filed rule to apply.  *See, e.g., Kellen Co., Inc. v. Calphalon Corp.*, 54 F. Supp. 2d 218, 222 (S.D.N.Y. 1999) (Parker, J.); *see also National Equipment Rental, Ltd. v. Fowler*, 287 F.2d 43, 45 (2d Cir. 1961) (the competing cases must "embrace[] essentially the same transactions"); *GMT Corp. v. Quiksilver*, Case No. 02 Civ. 2229, 2002 U.S. Dist. LEXIS 14195, *7 (S.D.N.Y. July 31, 2002) (Daniels, J.) ("The first-filed rule can be triggered even when the competing claims do not present the exact same issues."); *Manufacturers Hanover Trust Co. v. Palmer Corp.*, 798 F. Supp. 161, 167 (S.D.N.Y. 1992) (Haight, J.) ("The interests of justice require that the cases be related, not identical.").

Here, the Rhode Island Action and the New York Action clearly "arise out of the same factual grouping, transaction or series of transactions," "embrace essentially the same transactions," and are "related."  Both actions are based on the identical transactions -- the sales contracts between Chrisha and TL pursuant to which Chrisha agreed to purchase and TL agreed

---

[1] TL cites two Second Circuit cases in support of its assertion that the competing actions must be identical. *Curtis v. Citibank, N.A.*, 226 F.3d 133 (2d Cir. 2000); *In re Cuyahoga Equipment Corp.*, 980 F.2d 110 (2d Cir. 1992). However, neither case involves application of the "first-filed" rule. *Curtis* involves the plaintiffs' attempt to maintain two causes of action for the same relief in the same court against the same defendant, while *Cuyahoga Equipment* involves a party's motion to consolidate a bankruptcy action and an environmental cleanup action involving wholly distinct parties and claims.

[2] TL  but offers no legal support for its bald assertion that Rhode Island law applies to this motion.  To the contrary, courts in this Circuit have consistently applied the law of this Circuit -- and not the law of the competing jurisdiction -- to the analysis of the "first-filed" rule. *See, e.g., GMT Corp. v. Quiksilver*, Case No. 02 Civ. 2229, 2002 U.S. Dist. LEXIS 14195 (S.D.N.Y. July 31, 2002) (Daniels, J.); *Everest Capital Ltd. v. Everest Funds Management, L.L.C.*, 178 F. Supp. 2d 459 (S.D.N.Y. 2002) (Swain, J.); *Kellen Co., Inc. v. Calphalon Corp.*, 54 F. Supp. 2d 218 (S.D.N.Y. 1999) (Parker, J.); *Manufacturers Hanover Trust Co. v. Palmer Corp.*, 798 F. Supp. 161 (S.D.N.Y. 1992) (Haight, J.); *Interwood Marketing Ltd. v. Media Arts International Ltd.*, Case No. 90 Civ. 4690, 1990 U.S. Dist. LEXIS 16747 (S.D.N.Y. Dec. 12, 1990) (Sand, J.).

to manufacture and supply to Chrisha, non-defective and conforming goods. Each of the claims in this action plainly arises out of the same contracts and transactions or series of transactions between Chrisha and TL that are the subject of the Rhode Island Action. Upon reading the two complaints there is no ability to conclude otherwise. TL's complaint in this action merely asserts that money is due and owing to it as a result of the transactions that Chrisha has claimed in the Rhode Island Action entitle it to relief and damages against TL. Indeed, the claims asserted in this improperly filed second action are quite clearly nothing more than compulsory counterclaims in the Rhode Island action. *See* Fed. R. Civ. Pro. 13; *see also Critical-Vac Filtration Corp. v. Minuteman International Inc.*, 233 F.3d 697, 699 (2d Cir. 2000). Thus, Chrisha's motion to dismiss should be granted.

### C.    TL's Argument Regarding Improper Service in the Rhode Island Action is also not a Valid Basis to Deny Chrisha's Motion to Dismiss

First and foremost, whether service upon TL was properly performed in the Rhode Island Action is a matter solely for the Rhode Island District Court's determination. Second, the date of service is irrelevant to the "first-filed" rule analysis. Third, service upon TL in the Rhode Island Action was properly performed in accordance with Rule 4, Fed. R. Civ. P., and Hong Kong law. And, finally, *even if* service was not properly made, Chrisha can still perform valid service upon TL in the Rhode Island Action. Accordingly, Chrisha's motion to dismiss must be granted.

### 1.    It is for the Rhode Island District Court to Determine Whether Service Upon TL was Properly Performed

Whether Chrisha has or has not properly served  the summons and complaint in the Rhode Island Action is a matter solely for the Rhode Island Court to decide. *See, e.g., Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 605 (5th Cir. 1999) (in refusing to determine whether the first-filed court possessed jurisdiction over the first-filed action, the district court properly "avoided trenching on the authority of its sister court, one of 'the very abuses the first-

to-file rule is designated to prevent'"); *Nabors Drilling USA, L.P. v. Markow, Walker, P.A.*, 451 F. Supp. 2d 843, 846 & n. 1 (S.D. Miss. 2006) ("Obviously, it is not for this court to decide whether there is merit to Markow Walker's objections to venue and personal jurisdiction in Texas," the location of the first-filed action.  "Nor is it a prerequisite to application of the first-filed rule that the jurisdiction of the first-filed court must first have been established."); *Butera, Beausang, Cohen & Brennan, P.C. v. Ryan*, Case No. 00-2509, 2000 U.S. Dist. LEXIS 17878, *12 (E.D. Pa. Dec. 11, 2000) (second-filed court declined to "delve into issues" in first-filed action whose resolution might result in the dismissal of the first-filed action because such "intervention" would be "inappropriate").   Therefore, the Court cannot determine whether service was properly performed upon TL in the Rhode Island Action and must simply determine whether the Rhode Island Action was the first-filed action.

        2.     In any event, the Date of Service of the Complaint is not Relevant to the
                "First-Filed" Rule Analysis

It is well settled in this District that "first-filed" does not mean "first-served."  Rather, the only dates of significance in the "first-filed" rule analysis are the dates the competing actions were *filed.  See, e.g., MSK Insurance, Ltd. v. Employers Reinsurance Corp.*, 212 F. Supp. 2d 266, 267 n. 3 (S.D.N.Y. 2002) (Buchwald, J.) ("the relative dates of service are not relevant to this inquiry"); *Everest Capital Ltd. v. Everest Funds Management, L.L.C.*, 178 F. Supp. 2d 459, 462-464 (S.D.N.Y. 2002) (Swain, J.); *Hanson PLC v. Metro-Goldwyn-Mayer Inc.*, 932 F. Supp. 104, 107 n. 3 (S.D.N.Y. 1996) (Chin, J.) ("The date of filing, however, is generally controlling."); *Manufacturers Hanover Trust Co. v. Palmer Corp.*, 798 F. Supp. 161, 166 n. 3 (S.D.N.Y. 1992) (Haight, J.) ("as between the filing date and the date of service, the controlling event is the filing date"); *Interwood Marketing Ltd. v. Media Arts International Ltd.*, Case No. 90 Civ. 4690, 1990 U.S. Dist. LEXIS 16747, *7-8 (S.D.N.Y. 1990) (Sand, J.) ("This Court is

convinced that the better view is that the filing of the complaint is the event that determines whether an action is 'first-filed.'"); *Berisford Capital Corp. v. Central States, Southeast and Southwest Areas Pension Fund*, 677 F. Supp. 220, 222 n. 1 (S.D.N.Y. 1988) (Haight, J.) ("The 'first service' rule is not the law of this circuit."); *Horn & Hardart Co. v. Burger King Corp.*, 476 F. Supp. 1058, 1059 n.1 (S.D.N.Y. 1979) (Knapp, J.). Here, the Rhode Island Action was not only filed before the New York Action was filed, but was also *served* before the New York Action was filed. Nonetheless, even if the Rhode Island District Court determines that service upon TL in the Rhode Island Action was improperly performed, the Rhode Island Action was filed before the New York Action, which is the only date relevant to the "first-filed" rule analysis. Accordingly, since the Rhode Island Action was filed first, irrespective of the date of completion of service, the New York Action must be dismissed in favor of the Rhode Island Action.

### 3.   Chrisha Properly Served TL in the Rhode Island Action

In any event, Chrisha properly performed service upon TL in the Rhode Island Action under Rule 4, Fed. R. Civ. P. In fact, Chrisha performed valid service upon TL under both Rule 4(f)(2)(A) and Rule 4(f)(1).[3]

First, Chrisha's service upon TL comports with Rule 4(f)(1), Fed. R. Civ. P.[4] The "Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents" (the "Hague Convention") expressly states that it

---

[3] Rule 4(h), Fed. R. Civ. P., provides that service upon a foreign corporation outside the United States "shall be effected... in any manner prescribed for individuals by subsection (f) except personal delivery as provided in paragraph (2)(C)(i) thereof."

[4] Under Rule 4(f)(1), Fed. R. Civ. P., service is valid if performed in accordance with "any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents."

> shall not interfere with the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through judicial officers, officials or other competent persons of the State of destination.

20 U.S.T. 361, Article 10(c). As demonstrated in Chrisha's moving papers, counsel in Hong Kong, Wilkinson & Grist, competent persons in Hong Kong effected personal service upon TL at TL registered office in Hong Kong in compliance with Article 10 (c) of the Hague Convention. *See* Exhibit "2" to the "Declaration of Joseph K. Poe in Support of Chrisha Creations, Ltd.'s Motion to Dismiss" ("Poe Dec.").

Further, under Hong Kong law, service is properly effectuated by personally delivering the Summons and Complaint to the registered office of TL. *See* Rules of High Court, Order 65, Rules 2 and 3 (a copy of which is attached hereto for the Court's convenience as Appendix A).[5] Thus, under both the Hague Convention and under Hong Kong law, Chrisha's personal service of the summons and complaint upon TL was proper.[6]

Likewise, Chrisha's service upon TL comports with Rule 4(f)(2)(A), Fed. R. Civ. P. Under Rule 4(f)(2)(A), service is validly performed upon a foreign corporation outside the United States "in the manner prescribed by the law of the foreign country for service in that country in an action in any of its courts of general jurisdiction", provided that the service is reasonably calculated to give notice.[7] As demonstrated above, Chrisha correctly served TL with

---

[5] Service is also proper under Article 19 of the Hague Convention, which approves means of service which comply with Hong Kong Law.

[6] Accordingly, Point III of TL's Memorandum of Law in Opposition to Defendant's Motion to Dismiss (pages 7-9) misses the mark because it fails to address the other valid means of service under the Hague Convention.

[7] *See, e.g., New Line International Releasing, Inc. v. Marty Toy (USA), Inc.*, Case No. 91 Civ. 8638, 1995 U.S. Dist. LEXIS 7781, *5-6 (S.D.N.Y. June 7, 1995) (Keenan, J.) ("Under subdivision (f)(2)(A), service may be effected in a manner prescribed by the law of the foreign country in an action in any of its courts of general jurisdiction."); *Brockmeyer v. May*, 383 F.3d 798, 806 (9th Cir. 2004) ("Rule 4(f)(2)(A) affirmatively authorizes service by means used in the receiving country for service in an action in its courts of general jurisdiction. …[C]ourts have applied Rule 4(f)(2)(A) to approve personal service carried out in accordance with foreign law."); *Cosmetech International, LLC v. Der Kwei Enterprise and Co.*, 943 F. Supp. 311, 316 (S.D.N.Y 1996) (service of summons and complaint was made in accordance with Taiwan law and, therefore, service was proper under Rule 4).

the Summons and Complaint in the Rhode Island Action under the laws of Hong Kong and, accordingly, Chrisha's service upon TL in the Rhode Island Action is valid under Rule 4.

Moreover, *even if* Chrisha's service is technically invalid -- which it is not -- the Rhode Island District Court can and should declare the service valid since TL received *actual notice* of the Rhode Island Action and has so admitted in its complaint in this action. *See, e.g., Overseas Food Trading, Ltd. v. Agro Aceitunera S.A.*, Case No. 06-800, 2007 U.S. Dist. LEXIS 954, * 7-9 (D.N.J. Jan. 8, 2007) (denying motion to dismiss based on insufficiency of process because defendant received actual notice of the suit); *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 301-302 (2d Cir. 2005) ("Viertel does not dispute having received the complaint in this action, so like the defendants in Fox and Greene, there is no prejudice to him."); *Fox v. Regie Nationale Des Usines Renault*, 103 F.R.D. 453, *3-4 (W.D. Tenn. 1984) ("Rule 4 stresses actual notice, rather than strict formalism.").

Indeed, TL's actual notice of the Rhode Island Action, coupled with Chrisha's personal service of the summons and complaint at TL's registered office in Hong Kong, certainly comports with the constitutional requirement that notice be "reasonably calculated... to apprise interested parties of the pendency of the action." *Silver Top Ltd. v. Monterey Industries Ltd.*, Case No. 94 Civ. 5731, 1995 U.S. Dist. LEXIS 1981, *7 (S.D.N.Y. Feb. 10, 1995) (McKenna, J.) ("The Court finds that service by registered mail to Defendants' addresses as they appeared on file with the Registry was reasonably calculated to give notice under all of the circumstances and, therefore, was constitutionally valid."); *Burda Media*, 417 F.3d at 303. Certainly, if service by registered mail is reasonably calculated to apprise interested parties of an action, then personal service that was acknowledged by TL (as is the case here) absolutely complies with

8

constitutional due process. (Again, TL does not deny receiving service of the summons and complaint in the Rhode Island Action.)

Finally, TL's argument that the summons and complaint had to be translated into the official language of Hong Kong is flat wrong. *See, e.g., Lemme v. Wine of Japan Import, Inc.*, 631 F. Supp. 456, 464 (E.D.N.Y. 1986) ("the translation 'requirement' is triggered only when it is the Central Authority that serves the document" and "[t]he translation provision is actually not even mandatory").[8]  And, even if TL was correct, English -- the language in which the summons and complaint were drafted -- is an official language of Hong Kong. *See* U.S. Department of State Background Note: Hong Kong, annexed hereto as Appendix "B."

### 4.    Even if Service was not Properly Performed, Chrisha Can Still Perform Service Upon TL

*Even if* Chrisha's service upon TL in the Rhode Island Action was not properly performed, Chrisha can still perform service upon TL in that action. The 120-day time limit to perform service of the summons and complaint "does not apply to service in a foreign country pursuant to subdivision (f)."  Rule 4(m), Fed. R. Civ. P.; *see also Banco Central de Paraguay v. Paraguay Humanitarian Foundation, Inc.*, Case No. 01 Civ. 9649, 2005 U.S. Dist. LEXIS 26093, *11-12 (S.D.N.Y. Oct. 31, 2005) (Keenan, J.) ("Where service is in a foreign country, the Court uses a flexible due diligence standard to determine whether service of process was timely."); *Parkins v. St. John*, Case No. 01 Civ. 11660, 2004 U.S. Dist. LEXIS 13542, *7-8 (S.D.N.Y. July 16, 2004) (Casey, J.) ("Courts, however, have consistently recognized that the

---

[8] The cases cited by TL in support of its argument are inapposite. Both cases relate solely to service upon West German defendants in West Germany and declare **West Germany's** requirement that process be translated into German. *Vorhees v. Fischer & Krecke*, 697 F.2d 574, 575 (4th Cir. 1983) ("In signing the treaty, West Germany specified that judicial documents be forwarded through one of the various designated central authorities and that such documents be written in, or translated into, the German language."); *Teknekron Management, Inc. v. Quante Fernmeldetechnik GmbH*, 115 F.R.D. 175, 177 (D. Nev. 1987) ("In addition to the requirement that its 'central authorities' be used, West Germany also requires that all documents served be translated into the German language.").

120-day time limit does not apply to service in foreign countries of individual or corporate defendants."); *Yellowave Corp. v. Mana*, Case No. 00 Civ. 2267, 2000 U.S. Dist. LEXIS 14813, *6-7 (S.D.N.Y. Oct. 11, 2000) (Scheindlin, J.) (same); *D. Klein & Son, Inc. v. Good Decision, Inc.*, Case No. 98 Civ. 4083, 1999 U.S. Dist. LEXIS 7987, *3-4 (S.D.N.Y. May 28, 1999) (Keenan, J.); *Standard Commercial Tobacco Co., Inc. v. Mediterranean Shipping Co. S.A.*, Case No. 94 Civ. 7040, 1995 U.S. Dist. LEXIS 18877, *2-3 (S.D.N.Y. Dec. 19, 1995) (Leisure, J.).

### D.    TL Has Not Met Its Burden to Establish that an Exception to the First-Filed Rule Applies

TL has the burden of establishing that an exception to the first-filed rule applies. *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 555-556 (S.D.N.Y. 2000) (Sweet, J.) ("the party that seeks to deviate from the rule has the burden of demonstrating that circumstances justifying an exception exist"). TL has failed to establish that special circumstances exist or that the balance of convenience weighs in favor of departing from the well-entrenched first filed rule.

### CONCLUSION

This second-filed action must be dismissed in favor of the first-filed Rhode Island Action. Accordingly, Chrisha respectfully requests that the Court grant its motion to dismiss this action.

DATED:    Uniondale, New York
April 17, 2007

Respectfully Submitted,
RIVKIN RADLER LLP

By:  _____

Celeste M. Butera (CB 5659)
Joseph K. Poe (JP 1960)
926 RexCorp Plaza
Uniondale, New York 11556-0926
(516) 357-3000
Attorneys for Defendant
ROYAL INDEMNITY COMPANY

10

# APPENDIX A

# ORDER 65

## SERVICE OF DOCUMENTS

**Contents**

| | | para. |
|---|---|---|
| 1. | When personal service required (O.65, r.1) | 65/1 |
| 2. | Personal service: how effected (O.65, r.2) | 65/2 |
| 3. | Personal service on body corporate (O.65, r.3) | 65/3 |
| 4. | Substituted service (O.65, r.4) | 65/4 |
| 5. | Ordinary service: how effected (O.65, r.5) | 65/5 |
| 6. | Service on Attorney General in proceedings which are not by or against the Crown (O.65, r.6) | 65/6 |
| 7. | Effect of service after certain hours (O.65, r.7) | 65/7 |
| 8. | Affidavit of service (O.65, r.8) | 65/8 |
| 9. | No service required in certain cases (O.65, r.9) | 65/9 |
| 10. | Service of process on Sunday (O.65, r.10) | 65/10 |

**Editorial Introduction**  65/0/2

The RHC make elaborate provision as to service of proceedings and service of documents. The rules in O.65 deal in detail with the service of all documents, including all originating process, and provides not only for the manner of service, but also for substituted service. Order 10 (Service of Originating Process: General Provisions) deals in a general way with the service of originating process but it must be read in conjunction with O.65. Order 10, r.4 deals with the service of writs in certain actions for possession of land.

The structure of O.65 is based on the distinction between "personal service" and "ordinary service". Rule 1 states that personal service of a document is to be effected where this is required by an express provision of the Rules (see "Related Sources", para. 65/0/3 (below)) or by an order of the court.

Order 65, r.2 states that personal service is to be effected by leaving a copy of the document with the person to be served. There is an obvious difficulty in effecting service on a body corporate and this is tackled by r.3. This rule applies in cases "for which provision is not otherwise made by any "written law". Unfortunately, there are some other enactments (see paras 65/3/1 *et seq*). In addition this rule makes special provision for personal service of originating process on a body corporate (see r.3(2), relating back to the alternatives made available in O.10, r.1(2)).

Rule 4 states that if, in the case of any document which by virtue of any provision of the rules is required to be served personally, or a document to which O.10, r.1 applies, it appears to the court that it is impracticable for any reason to serve that document in the manner prescribed, the court may make an order for substituted service of that document. The substituted service provision in r.4 is the best known of the exceptions to, as distinct from alternatives to, the personal service rule.

The effecting of ordinary service of a document (as distinct from personal service) is dealt with in r.5. The methods approved are (i) by leaving at a proper address, (ii) by post, and (iii) through a document exchange.

The remaining rules in O.65 deal with the effect of service after certain hours (r.7), the affidavit of service (r.8), the certain limited circumstances when service of a document is not required (r.9), and the restriction of service or execution of process on a Sunday (r.10). Rule 6 makes special provision for service on the Secretary for Justice, etc., in proceedings which are not by or against the Government.

**Related Sources**  65/0/3

- RHC, O.10 (Service of originating process: general provisions)
- See also documents listed at para. 65/2/2.

## When personal service required (O.65, r.1)  65/1

1.—(1) Any document which by virtue of these rules is required to be served on any person need not be served personally unless the document is one which by an express provision of these rules or by order of the Court is required to be so served.

(2) Paragraph (1) shall not affect the power of the Court, under any provision of these rules to dispense with the requirement for personal service.

## Personal service: how effected (O.65, r.2)

**65/2**   **2.** Personal service of a document is effected by leaving a copy of the document with the person to be served.

**65/2/1**   **Personal service and ordinary service**—A distinction is drawn between "personal service" and "ordinary service". For manner of effecting personal service, see r.2; for manner of effecting ordinary service, see r.5. Power to dispense with the requirement for personal service is given by r.4 (substituted service). There is no implied power in the court to dispense with personal service where this is required by an express provision of the RHC.

**65/2/2**   **Documents of which personal service is required**—These can be divided into two classes—(1) any documents to be served on persons other than plaintiffs or other parties to the cause or matter who have acknowledged service of the writ or other originating process; (2) orders, obedience to which may be enforced by committal or sequestration, see O.45, r.7. The phrase "served on the person" is not to be equated with "personal service" or "serve personally". Personal service is not required for a summons issued under O.45, r.6(3) (*Zida Technologies Ltd v. Tiga Technologies Ltd & Others*, unreported, HCA No. 5617 of 2000, January 22, 2001, [2001] H.K.E.C. 334, Deputy Judge To). Other documents need not be personally served, but can be served in one of the modes mentioned in r.5.

The following is a list of the documents of which personal service is requisite, subject to para. (2):

(1) Writ of summons (O.10, r.1).
(2) Amended writ of summons without leave and before service unless the court otherwise directs (O.20, r.1(2)).
(3) Writ of summons for service out of the jurisdiction (O.11, r.3, O.10, r.1).
(4) Third party notice to person not a party to the action (O.16, r.3(4)).
(5) Defence and counterclaim against a person not a party to the action (O.15, r.3(5)).
(6) Originating summons (O.10, r.5).
(7) Originating notice of motion (O.10, r.5).
(8) Originating petition (O.10, r.5).
(9) Summons for leave to enforce a representative judgment against a non-party (O.15, r.12(4)).
(10) Order to carry on proceedings, to be served on a person who is not already a party thereto (O.15, rr.7 and 8).
(11) Summons for leave to issue execution against a partner under a judgment against a firm (O.81, r.5(4)).
(12) Order to do an act (unless it is an order for discovery or inspection of documents, O.24, r.16, or for interrogatories, O.26, r.6) if it is intended to enforce it by committal (O.45, r.7).
(13) Notice of motion for committal in cases to which O.52, r.3(3) applies, unless the court dispenses with such service (O.52, r.3(4)).
(14) Notice of motion for leave to issue a writ of sequestration (O.46, r.5(2)) unless the court dispenses with such service (O.46, r.5(3)).
(15) Notice of motion for committal in other cases, where personal service can be effected (*O'Donovan v. O'Donovan* [1955] 1 W.L.R. 1086; [1955] 3 All E.R 27n).
(16) Writ of habeas corpus *ad subjiciendum*, if personal service is possible (O.54, r.6).
(17) Writ of *subpoena* (O.38, r.17).
(18) A *garnishee* order nisi (when being served on the *garnishee*) (O.49, r.3(1)(a)).
(19) An order for examination of a judgment debtor (O.48, r.1(2), O.49B, r.1).
(20) A notice of registration of a foreign judgment may be served either personally or by sending it to the judgment debtor at his usual or last known address (unless the court orders otherwise (O.71, r.7).

**65/2/3**   **Manner of effecting personal service**—To effect personal service the clerk or other person entrusted with the task should first satisfy himself that he has found the correct person. He should then hand to or leave with the person to be served a copy of the writ. If the person served will not take the copy, he should tell him what it contains and leave it as nearly in his possession or control as he can.

If the defendant refuses to take the copy writ it is not necessary to leave it in his actual corporeal possession, but it is sufficient to inform him of its nature and throw it down in his presence (*per* Patteson J. in *Thomson v. Pheney* (1832) 1 Dowl. 441); yet this must be done under such circumstances as to bring the case within the above rule. It is not sufficient to hand the defendant the copy writ enclosed in an envelope without informing him that it is a copy writ (*Banque Russe v. Clark* [1894] W.N. 203).

## Time for effecting service

**65/2/4**   **Sunday, Service on**—Rule 10 states that no process shall be served or executed within the jurisdiction on a Sunday except, in case of urgency, with the leave of the court. In this context, "process" includes a writ, judgment, notice, order, petition, originating or other summons or warrant. A writ *in rem* may be served and a warrant of arrest executed on a Sunday, since r.10 does not apply to those processes (see O.75, r.11(8)).

**Writ of summons and other originating process**—A writ of summons, as long as it is in force, may be served at any time of the day or night (*Murray v. Stephenson* (1887) 19 Q.B.D. 60); except on Sundays (see r.10). Where a writ or other originating process is served after 4 pm but before midnight, the date from which time for acknowledging service is calculated to include that day. **65/2/5**

**Other documents**—In strict theory, all pleadings, notice or other documents may be served at any time before midnight on all weekdays, except Saturdays, but if such service is effected between 4 p.m. on a Saturday and midnight on the following day or after 4 pm of any other week day, such service will, for the purpose of computing any period of time after service of the document, be deemed to have been served on the Monday following that Saturday or on the day following that other weekday, as the case may be (see r.7). **65/2/6**

As to service of summons for hearings in chambers, see para. 32/3/1. **65/2/6**

**Affidavit of service**—Rule 8 provides that an affidavit of service of any document must state by whom the document was served, the day of the week and date on which it was served, where it was served and how. **65/2/7**

## Personal service on body corporate (O.65, r.3)

**3.**—(1) Personal service of a document on a body corporate may, in cases for which provision is not otherwise made by any written law, be effected by serving it in accordance with rule 2 on the chairman or president of the body, or the clerk, secretary, treasurer or other similar officer thereof. **65/3**

(2) Where a writ is served on a body corporate in accordance with Order 10, rule 1(2), that rule shall have effect as if for the reference to the usual or last known address of the defendant there were substituted a reference to the registered or principal office of the body corporate and as if for the reference to the knowledge of the defendant there were substituted a reference to the knowledge of a person mentioned in paragraph (1).

**Effect of rule**—The rule applies to all documents requiring personal service on a body corporate, including, of course, a writ of summons or other originating process. **65/3/1**

This rule draws an emphatic distinction between (1) cases in which provision for service of a document on a body corporate is made by statute, and (2) cases in which no such provision is made. In this way, all statutory modes of service on bodies corporate are preserved. In the former cases, service must be effected in accordance with the relevant statutory provision (the best-known examples are provided by the statutory provisions dealing with service on domestic and foreign companies).

**"cases for which provision is not otherwise made by any written law"**—In the latter cases, service of a document may be effected by one or other of the modes provided in this rule, that is to say, by personal service in accordance with r.2 on one or other of the persons specified in r.3(1). **65/3/2**

Order 10, r.1(2) provides that a writ for service on a defendant within the jurisdiction may, instead of being served personally on him, be served by post or by insertion through a letter-box. Where a plaintiff wishes to serve a writ on a defendant in the form of a body corporate (for whom provision for service is not otherwise made by any enactment) he may take advantage of the alternatives to personal service provided by r.1(2). In this event, O.10, r.1(2) & (3) should be read (1) as if for the reference to the usual or last known address of the defendant there was substituted a reference "to the registered or principal office of the body corporate"; and (2) as if the reference to the knowledge of the defendant there was substituted a reference "to the knowledge of a person mentioned in paragraph (1) of this rule" (r. 3(2)).

A partnership firm is not a body corporate (for service of documents on partnerships, see O.81). A company incorporated by a foreign statute may properly be described as a "body corporate" but as special provision for service of documents on foreign corporation is made elsewhere the terms of r.3 do not apply. A foreign partnership firm is not a body corporate within r.3 (*La Bourgogne* [1899] P. 1; affirmed [1899] A.C. 431) (see O.81, r.1 and 2, and n. "Carrying on business within the jurisdiction", para. 81/1/19). **65/3/3**

In the following paragraphs, the position of some particular organisations, etc. (not including companies), is briefly explained.

**Charitable institution—unincorporated**—The proper practice is to sue the treasurer or secretary or some other responsible officer of the charity "on behalf of the Charity" (naming it) who should be served (*Re Pritt, Morton v. National Church League* (1915) 31 T.L.R. 299; (1916) 85 L.J.Ch. 166). If the charity is sued by its name, the writ or process may be served personally on the treasurer, secretary or other head officer, at the head office, and if the officer is served elsewhere than at the head office of the institution, a copy must also be left there or the writ or process may be served by post or insertion through the letter-box at the proper address under para. 2(2). **65/3/4**

SERVICE OF DOCUMENTS

**65/3/5**   **Club**—A members' club is not a society or fellowship for which provision has been made, and service on the secretary is bad (*Grossman v. The Granville Club* (1884) 28 S.J. 513). And such a club cannot be a defendant to an action in the club name, such name not being that of a corporation nor of an individual, nor of a partnership, which apart from statute, are the only legal entities capable of being sued; *cf.* judgment of M.R., *Taff Vale Ry v. Amalgamated Soc. of Ry Servants* [1901] 1 K.B. 170 at 173, and consider *ibid.* [1901] A.C. 426. In a proper case, the proceedings may be brought against representative defendants under O.15, r.12. Persons carrying on a proprietary club may be sued in name of the club, and may for purposes of service be treated as a partnership (see *Campbell v. Thompson* [1953] 1 Q.B. 445; [1953] 1 All E.R. 831; *cf.* O.81, r.3).

**65/3/6**   **Trade unions**—See Trade Unions Ordinance (Cap. 332). Every trade union must be registered under the Ordinance. By s.13 the registration of a trade union under the Ordinance shall render it a body corporate, which thus may be sued in its own name.

**65/3/7**   **Companies**—It was explained above, that r.3 draws an emphatic distinction between (1) cases in which provision for service of a document on a body corporate is made by statute, and (2) cases in which no such provision is made. The terms of r.3 apply to the latter cases. In the former cases, service must be effected in accordance with the relevant statutory provision.

    As a practical matter, the most important of the statutory provisions dealing with the service of documents (including originating process) on a body corporate are found in Part XI of the Companies Ordinance (Cap. 32). These are considered below. (For obvious reasons, much of the relevant case law and important points of practice are concerned with the service of originating process documents.)

**65/3/8**   **Registered companies**—**Companies Ordinance (Cap. 32), s.356**—Section 356 of the Ordinance states that a document may be served on a company by leaving it at, or sending it by post to, the company's registered office. In *Guangdong International Trust and Investment Corp. Hong Kong (Holdings) Ltd v. Yuet Wah (Hong Kong) Wah Fat Ltd* [1997] H.K.L.R.D. 489; [1997] 2 H.K.C. 696 Keith J. held that service on a company was governed by RHC, O.10, r.1 and O.65, r.3(2).

**65/3/9**   **Proof of service**—It is sufficient to prove either that the writ was left at the registered office, without showing with whom; or that a letter, prepaid and duly addressed, containing the writ, was posted to the registered office of the company. By s.8 of the Interpretation and General Clauses Ordinance (Cap. 1), service of a document in accordance with that section is deemed "to have been effected at the time at which the letter would be delivered in the ordinary course of post".

**65/3/10**   **Company without registered office**—In the case of a limited company having no registered office as required by the Companies Ordinance service should be effected under r.3, this being an event "for which provision is not otherwise made by any enactment" within the rule.

**65/3/11**   **Service on foreign corporation in HK**—**Companies Ordinance, s.338**—Section 333(1)(c) of the Companies Ordinance states that an "oversea company", shall within one month of establishing a place of business, deliver to the registrar of companies for registration, a return in the prescribed form containing, *inter alia*, "a list of the names and addresses of some one or more persons resident in Hong Kong authorised to accept on the company's behalf service of process and any notices required to be served on it".

    The mode of service for any process required to be served on an oversea company is provided for by s.338(1) of the Companies Ordinance. The section states that such service is sufficiently made if the process is addressed to any person whose name has been delivered to the registrar and is "left at or sent by post to the address which has been so delivered". Section 338(2) governs service in circumstances where the oversea company has established a place of business in Hong Kong but has failed to register the name of its representative, or that representative is *e.g.* dead, etc.

    It is a question of fact whether an oversea company has established a "place of business" (as defined in s.341 of the Companies Ordinance) within Hong Kong: *English Sewing (HK) Ltd & Others v. Eastern Shipping Lines Inc.* [1984] H.K.L.R. 5.

    RHC, O.10, r.2 in certain circumstances enables service of a writ on a local agent on behalf of the overseas principal.

**65/3/12**   **Agreement as to mode of service by foreign corporation**—Defendants can agree to a particular mode of service and appoint a particular person to accept service (*Montgomery & Co. v. Liebenthal & Co.* [1898] 1 Q.B. 487).

**65/3/13**   **Note**—The principal office must be one which the company actually uses as opposed to one which has been vacated (see *Guangdong International Trust & Investment Corp. Hong Kong (Holdings) Ltd v. Yuet Wah (Hong Kong) Wah Fat Ltd & Another* [1997] H.K.L.R.D. 489).

**Substituted service (O.65, r.4)**

**65/4**   (1) If, in the case of any document which by virtue of any provision of these rules is required to be served personally or in the case of a document to which Order 10, rule 1, applies, it appears to the Court that it is impracticable

# APPENDIX B



## U.S. DEPARTMENT *of* STATE

**Bureau of East Asian and Pacific Affairs**
**March 2007**

People

History

Government

Political Conditions

Economy

Foreign Relations

U.S. Relations

Travel/Business

Background Notes A-Z

## Background Note: Hong Kong



## PROFILE

**OFFICIAL NAME:**
Hong Kong Special Administrative Region

**Geography**
Area: 1,104 sq. km.; Hong Kong comprises Hong Kong Island, Kowloon, the New Territories, and numerous small islands.
Terrain: Hilly to mountainous, with steep slopes and natural harbor.
Climate: Tropical monsoon. Cool and humid in winter, hot and rainy from spring through summer, warm and sunny in fall.

**People**
Population (2006): 6.9 million.
Population growth rate (2006): 0.9%.
Ethnic groups: Chinese 95%; other 5%.
Religions: About 43% participate in some form of religious practice. Christian, about 9.6%.
Languages: Cantonese (a dialect of Chinese) and English are official.
Education: *Literacy*--92% (95% male, 88% female).
Health (2006): *Infant mortality rate*--1.8/1,000. *Life expectancy*--82.6 yrs. (overall); 79.5 yrs. males, 85.6 yrs. females.
Work force (2006): 3.6 million. *Wholesale, retail, and import/export trades and restaurants and hotels*--28.9%; *finance, insurance, real estate, and business services*--13.3%; *manufacturing*--4.4%.

**Government**
Type: Special Administrative Region (SAR) of China, with its own constitution (the Basic Law).
Branches: *Executive*--Administration: Chief Executive selected in March 2007; Executive Council, serving in an advisory role for the Chief Executive. *Legislative*--Legislative Council elected in September 2004. *Judicial*--Court of Final Appeal is highest court, other lower courts.
Subdivisions: Hong Kong, Kowloon, New Territories.
Suffrage: Permanent residents, at 18 years or over, living in Hong Kong for the past 7 years are eligible to vote.

**Economy** (2006)
GDP (2006): $188.8 billion.
GDP real growth rate (2006): 6.8%.
Per capita GDP (2006): $27,527.
Natural resources: Outstanding deepwater harbor.
Industry: *Types*--textiles, clothing, electronics, plastics, toys, watches, clocks.
Trade: *Exports*--$315.5 billion: clothing, electronics, textiles, watches and clocks, office machinery. *Imports*--$333.3 billion: consumer goods, raw materials and semi-manufactures,

capital goods, foodstuffs, fuels.

**PEOPLE**
Hong Kong's population has increased steadily over the past decade, reaching about 6.9 million by 2006. Hong Kong is one of the most densely populated areas in the world, with an overall density of some 6,250 people per square kilometer. Cantonese, the official Chinese language in Hong Kong, is spoken by most of the population. English, also an official language, is widely understood. It is spoken by more than one-third of the population. Every major religion is practiced freely in Hong Kong. All children are required by law to be in full-time education between the ages of 6 and 15. Preschool education for most children begins at age 3. Primary school begins normally at the age of 6 and lasts for 6 years. At about age 12, children progress to a 3-year course of junior secondary education. Most stay on for a 2-year senior secondary course, while others join full-time vocational training. More than 90% of children complete upper secondary education or equivalent vocational education.

**HISTORY**
According to archaeological studies initiated in the 1920s, human activity on Hong Kong dates back over five millennia. Excavated neolithic artifacts suggest an influence from northern Chinese stone-age cultures. The territory was settled by Han Chinese during the seventh century, A.D., evidenced by the discovery of an ancient tomb at Lei Cheung Uk in Kowloon. The first major migration from northern China to Hong Kong occurred during the Sung Dynasty (960-1279). The British East India Company made the first successful sea venture to China in 1699, and Hong Kong's trade with British merchants developed rapidly soon after. After the Chinese defeat in the First Opium War (1839-42), Hong Kong was ceded to Britain in 1842 under the Treaty of Nanking. Britain was granted a perpetual lease on the Kowloon Peninsula under the 1860 Convention of Beijing, which formally ended hostilities in the Second Opium War (1856-58). The United Kingdom, concerned that Hong Kong could not be defended unless surrounding areas also were under British control, executed a 99-year lease of the New Territories in 1898, significantly expanding the size of the Hong Kong colony.

In the late 19th century and early 20th centuries, Hong Kong developed as a warehousing and distribution center for U.K. trade with southern China. After the end of World War II and the communist takeover of Mainland China in 1949, hundreds of thousands of people fled from China to Hong Kong. Hong Kong became an economic success and a manufacturing, commercial, finance, and tourism center. High life expectancy, literacy, per capita income, and other socioeconomic measures attest to Hong Kong's achievements over the last five decades.

On July 1, 1997, China resumed the exercise of sovereignty over Hong Kong, ending more than 150 years of British colonial rule. Hong Kong is a Special Administrative Region of the People's Republic of China with a degree of autonomy in all matters except foreign and defense affairs. According to the Sino-British Joint Declaration (1984) and the Basic Law, Hong Kong will retain its political, economic, and judicial systems and unique way of life for 50 years after reversion and will continue to participate in international agreements and organizations under the name, "Hong Kong, China."

**GOVERNMENT AND POLITICAL CONDITIONS**
The Hong Kong Special Administrative Region (SAR) is headed by Chief Executive Donald Tsang, who first took office in 2005 and whose current term ends in 2012. The Election Committee that votes on the Chief Executive is made up of approximately 800 Hong Kong residents from four constituency groups: commercial, industrial, and financial interests; professionals; labor, social services, and religious interests; and the legislature, the Chinese People's Political Consultative Conference, and the P.R.C. National People's Congress.

In December 2006, supporters of pro-democracy Civic Party legislator Alan Leong won 134 seats in the Election Committee, enabling Leong to challenge incumbent Chief Executive Tsang's bid for a new five-year term in 2007. Tsang, with solid support from the pro-government and pro-business sectors, won the March 25, 2007 Election Committee vote with 649 of the 795 votes. Leong garnered 123 votes.

In July 2002, the Hong Kong Government implemented the Principal Officials Accountability System, which was designed to make the government more responsive to public concerns.

Eleven political appointees, directly responsible to the Chief Executive, were added to run the 11 policy bureaus. Three other senior civil service positions--the Chief Secretary, Financial Secretary, and Justice Secretary--also were converted to political appointments.

While Hong Kong remains a free and open society where human rights are respected, courts are independent, and there is well-established respect for the rule of law, residents are limited in their ability to change their government, and the legislature is limited in its power to affect government policies. The September 12, 2004 Legislative Council elections were seen as generally free, open, and widely contested, although Hong Kong groups have alleged voter intimidation, manipulation, or pressure in connection with them.

In April 2004, the P.R.C. National People's Congress Standing Committee issued a decision on the scope and pace of constitutional reform, which laid out certain conditions for the process of democratic development. This decision precluded major changes to the electoral systems for the 2007 Chief Executive and 2008 Legislative Council elections, with the result that no significant reform of the electoral systems can be realized until the Chief Executive and Legislative Council elections scheduled for 2012.

In December 2005 the Legislative Council rejected a Hong Kong Government-proposed package of incremental reforms to the mechanisms for choosing the Chief Executive in 2007 and forming the Legislative Council in 2008. In mid-2007, the Hong Kong Government's Commission on Strategic Development is scheduled to issue new proposals to reform the Chief Executive and Legislative Council electoral mechanisms, with the "ultimate aim" of universal suffrage as prescribed by the Basic Law.

**Principal Government Officials**
Chief Executive--Donald Tsang
Chief Secretary--Rafael Hui
Financial Secretary--Henry Tang
Secretary for Justice--Wong Yan-long
Secretary for Security--Ambrose Lee
Secretary for Commerce, Industry and Technology--Joseph Wong
Secretary for Housing, Planning and Lands--Michael Suen
Secretary for Education and Manpower--Arthur Li
Secretary for Health, Welfare and Food--Dr. York Chow
Secretary for the Civil Service--Denise Yue
Secretary for Home Affairs--Patrick Ho
Secretary for Economic Development and Labor--Stephen Ip
Secretary for the Environment, Transport and Works--Sarah Liao
Secretary for Financial Services and the Treasury--Frederick Ma
Secretary for Constitutional Affairs--Stephen Lam

**ECONOMY**
Hong Kong is one of the world's most open and dynamic economies. Hong Kong per capita GDP is comparable to other developed countries. Real GDP expanded by 6.8% in 2006 year-on-year, driven by thriving exports, vibrant inbound tourism and strong consumer spending. Severe acute respiratory syndrome (SARS) caused the Hong Kong economy to shrink during the first half of 2003, and property prices had fallen 66% from their late 1997 peak, but have since rebounded by about 59% from that lower base. The unemployment rate declined to 4.3% in December 2006-February 2007, the lowest level since mid-1998. The surplus for fiscal year 2006-07 was $7.1 billion or 3.7% of GDP, attributed to the robust economy, increased corporate profits and salaries, the buoyant stock market, and a stable property market.

Hong Kong enjoys a number of economic strengths, including accumulated public and private wealth from decades of unprecedented growth, a sound banking system, virtually no public debt, a strong legal system, and an able and rigorously enforced anti-corruption regime. The need for economic restructuring poses difficult challenges and choices for the government. Hong Kong is endeavoring to improve its attractiveness as a commercial and trading center, especially after China's entry into the World Trade Organization (WTO), and continues to refine its financial architecture. The government is deepening its economic interaction with the Pearl River Delta in an effort to maintain Hong Kong's position as a gateway to China. These efforts include the conclusion of a free trade agreement with China, the Closer

Economic Partnership Arrangement (CEPA), which applies zero tariffs to all Hong Kong-origin goods and preferential treatment in 27 service sectors. Hong Kong, along with the Macau SAR, is also participating in a new pan-Pearl River Delta trade block with nine Chinese provinces, which aims to lower trade barriers among members, standardize regulations, and improve infrastructure. U.S. companies have a generally favorable view of Hong Kong's business environment, including its legal system and the free flow of information, low taxation, and infrastructure. The American Chamber of Commerce's annual business confidence survey, released in December 2006, showed 100% of respondents had a "good" or "satisfactory" outlook for 2007. Survey results indicated a positive economic outlook through 2009.

On the international front, Hong Kong is a separate and active member of the WTO and the Asia Pacific Economic Cooperation (APEC) forum, where it is an articulate and effective champion of free markets and the reduction of trade barriers. Hong Kong residents across the political spectrum supported China's accession to the WTO, believing this would open new opportunities on the mainland for local firms and stabilize relations between Hong Kong's two most important trade and investment partners, the United States and China.

**FOREIGN RELATIONS**
Hong Kong's foreign relations and defense are the responsibility of China. Hong Kong is an independent customs territory and economic entity separate from the rest of China and is able to enter into international agreements on its own behalf in commercial and economic matters. Hong Kong, independently of China, participates as a full member of numerous international economic organizations including the World Trade Organization (WTO), the Asia Pacific Economic Cooperation forum (APEC), and the Financial Action Task Force (FATF).

**U.S.-HONG KONG RELATIONS**
U.S. policy toward Hong Kong, grounded in a determination to promote Hong Kong's prosperity, autonomy, and way of life, is stated in the U.S.-Hong Kong Policy Act of 1992. The United States maintains substantial economic and political interests in Hong Kong. The United States supports Hong Kong's autonomy by concluding and implementing bilateral agreements; promoting trade and investment; arranging high-level visits; broadening law enforcement cooperation; bolstering educational, academic, and cultural links; and supporting the large community of U.S. citizens and visitors.

Hong Kong is an active member of the global coalition against terrorism. Hong Kong has joined the Container Security Initiative and remains an important partner with regard to eliminating funding for terrorist networks and combating money laundering. Hong Kong has passed legislation designed to bring Hong Kong into compliance with applicable UN anti-terror resolutions and Financial Action Task Force recommendations.

The United States has substantial economic and social ties with Hong Kong. There are some 1,100 U.S. firms, including 889 regional operations (295 regional headquarters and 594 regional offices), and about 54,000 American residents in Hong Kong. According to U.S. Government statistics, U.S. exports to Hong Kong totaled $17.8 billion in 2006. U.S. direct investment in Hong Kong at the end of 2005 totaled about $37.9 billion, making the United States one of Hong Kong's largest investors, along with China, Japan, and the Netherlands.

The United States and Hong Kong signed a civil aviation agreement in October 2002, which significantly liberalized the aviation market. Hong Kong enjoys a high degree of autonomy as a separate customs territory, with no changes to borders, staffing, or technology export controls since the 1997 handover. Intellectual property rights (IPR) protection has improved substantially in recent years and the introduction of effective new legislation to control illicit production and improved enforcement has now made Hong Kong a regional model for effective IPR protection. The Office of the U.S. Trade Representative and other U.S. agencies now regularly cite Hong Kong as an example for others.

The Hong Kong Government maintains three Economic and Trade Offices in the United States. Addresses, telephone numbers, and web sites for these offices are listed below:

1520 - 18th Street NW
Washington, DC 20036

Tel: (202) 331-8947
Fax: (202) 331-8958
Web Site: http://www.hketowashington.gov.hk/dc/index.htm

115 East 54th Street
New York, NY 10022
Tel: (212) 752-3320
Fax: (212) 752-3395
Web Site: http://www.hketony.gov.hk/ny/index.htm

130 Montgomery Street
San Francisco, CA 94104
Tel: (415) 835-9300
Fax: (415) 421-0646
Web Site: http://www.hketosf.gov.hk/sf/index.htm

**Principal U.S. Officials**
Consul General--James B. Cunningham
Deputy Principal Officer--Marlene Sakaue

The U.S. Consulate General is located at 26 Garden Road, Hong Kong. Tel: (852) 2523-9011 (general). Fax: (852) 2845-1598 (general); (852) 2147-5790 (consular); (852) 2845-9800 (commercial).

**TRAVEL AND BUSINESS INFORMATION**
The U.S. Department of State's Consular Information Program advises Americans traveling and residing abroad through Consular Information Sheets, Public Announcements, and Travel Warnings. **Consular Information Sheets** exist for all countries and include information on entry and exit requirements, currency regulations, health conditions, safety and security, crime, political disturbances, and the addresses of the U.S. embassies and consulates abroad. **Public Announcements** are issued to disseminate information quickly about terrorist threats and other relatively short-term conditions overseas that pose significant risks to the security of American travelers. **Travel Warnings** are issued when the State Department recommends that Americans avoid travel to a certain country because the situation is dangerous or unstable.

For the latest security information, Americans living and traveling abroad should regularly monitor the Department's Bureau of Consular Affairs Internet web site at http://www.travel.state.gov, where the current Worldwide Caution, Public Announcements, and Travel Warnings can be found. Consular Affairs Publications, which contain information on obtaining passports and planning a safe trip abroad, are also available at http://www.travel.state.gov. For additional information on international travel, see http://www.usa.gov/Citizen/Topics/Travel/International.shtml.

The Department of State encourages all U.S citizens who traveling or residing abroad to register via the State Department's travel registration website or at the nearest U.S. embassy or consulate abroad. Registration will make your presence and whereabouts known in case it is necessary to contact you in an emergency and will enable you to receive up-to-date information on security conditions.

Emergency information concerning Americans traveling abroad may be obtained by calling 1-888-407-4747 toll free in the U.S. and Canada or the regular toll line 1-202-501-4444 for callers outside the U.S. and Canada.

The National Passport Information Center (NPIC) is the U.S. Department of State's single, centralized public contact center for U.S. passport information. Telephone: 1-877-4USA-PPT (1-877-487-2778). Customer service representatives and operators for TDD/TTY are available Monday-Friday, 7:00 a.m. to 12:00 midnight, Eastern Time, excluding federal holidays.

Travelers can check the latest health information with the U.S. Centers for Disease Control

and Prevention in Atlanta, Georgia. A hotline at 877-FYI-TRIP (877-394-8747) and a web site at http://www.cdc.gov/travel/index.htm give the most recent health advisories, immunization recommendations or requirements, and advice on food and drinking water safety for regions and countries. A booklet entitled "Health Information for International Travel" (HHS publication number CDC-95-8280) is available from the U.S. Government Printing Office, Washington, DC 20402, tel. (202) 512-1800.

**Further Electronic Information**
**Department of State Web Site**. Available on the Internet at http://www.state.gov, the Department of State web site provides timely, global access to official U.S. foreign policy information, including Background Notes and daily press briefings along with the directory of key officers of Foreign Service posts and more. The Overseas Security Advisory Council (OSAC) provides security information and regional news that impact U.S. companies working abroad through its website http://www.osac.gov

Export.gov provides a portal to all export-related assistance and market information offered by the federal government and provides trade leads, free export counseling, help with the export process, and more.

STAT-USA/Internet, a service of the U.S. Department of Commerce, provides authoritative economic, business, and international trade information from the Federal government. The site includes current and historical trade-related releases, international market research, trade opportunities, and country analysis and provides access to the National Trade Data Bank.